F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   SEP 1 5 2021   ★

LONG ISLAND OFFICE

DMP:DKK
F. #2017R01178

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     - against –

CONSTRUCTURE
   TECHNOLOGIES, LLC,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

DEFERRED PROSECUTION AGREEMENT

Cr. No. <u>21-368 (JS)</u>

        Defendant Constructure Technologies ("Constructure" or the "Company"), pursuant to

authority granted by the Company's owners, Michael Calabria and Joseph Keegan, and the

United States Attorney's Office for the Eastern District of New York (the "Office"), enter into

this deferred prosecution agreement (the "Agreement").

<u>CRIMINAL INFORMATION AND ACCEPTANCE OF RESPONSIBILITY</u>

        1.      The Company acknowledges and agrees that the Office will file a criminal

information (the "Information") in the United States District Court for the Eastern District of

New York charging the Company with a violation of the Digital Millennium Copyright Act

("DMCA"), Title 17, United States Code, Sections 1201(a)(1)(A) and 1204(a)(1).  In so doing,

the Company: (a) knowingly waives its right to indictment on these charges, as well as all rights

to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18,

United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) knowingly

waives any objection with respect to venue to any charges by the United States arising out of the

conduct described in the Statement of Facts, which is attached to this Agreement as Attachment

A ("Statement of Facts"), and (c) consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York. The Office agrees to defer prosecution of the Company pursuant to the terms and conditions described below.

2.     The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate.   Should the Office pursue the prosecution that is deferred by this Agreement, the Company stipulates to the admissibility of the Statement of Facts in any proceeding, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.

TERM OF THE AGREEMENT

3.     This Agreement is effective for a period beginning on the date on which the Information is filed and ending three (3) years from the date on which the Information is filed (the "Term").   The Company agrees, however, that, in the event the Office determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement, an extension or extensions of the term of the Agreement may be imposed by the Office, in its sole discretion, for up to a total additional time period of one year, without prejudice to the Office's right to proceed as provided in Paragraphs 12 through 15 below.   If the Court rejects the Agreement, all the provisions of the Agreement shall be deemed null and void, and the Term shall be deemed to have not begun.

2

<u>RELEVANT CONSIDERATIONS</u>

4.      The Office enters into this Agreement based on the individual facts and circumstances presented by this case, including:

        a.      The Company received credit, in addition to the two-point downward adjustment to the Sentencing Guidelines, as discussed below, of approximately 15 percent off the base fine for its cooperation with the Office's investigation;

        b.      The Company did not voluntarily self-disclose the offense conduct to the Office, and as a result the Company was not eligible for a more significant discount on the fine amount or the form of resolution;

        c.      The seriousness of the offense conduct including the fact that the conduct occurred at a high level within the Company;

        d.      The Company has no prior criminal history; and

        e.      The Company has committed to continuing to cooperate with the Office as described in Paragraph 5 below.

<u>FUTURE COOPERATION AND DISCLOSURE REQUIREMENTS</u>

5.      The Company shall cooperate fully with the Office in any and all matters relating to the conduct described in this Agreement and the Statement of Facts, any individual or entity referred to therein, as well as other conduct related to violations of the DMCA or copyright laws and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term.  At the request of the Office, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, in any investigation of the Company or any of its present or

3

former officers, directors, employees, agents, and consultants, or any other party. The Company agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

      a.      The Company shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Office, upon request, any document, record or other tangible evidence about which the Office may inquire of the Company;

      b.      Upon request of the Office, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Office the information and materials described in Paragraph 5(a) above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information;

      c.      The Company shall use its best efforts to make available for interviews or testimony, as requested by the Office, present or former officers, directors, employees, agents and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation; and

4

d.     With respect to any information, testimony, documents, records or other tangible evidence provided to the Office pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities, of such materials as the Office, in its sole discretion, shall deem appropriate.

6.     In addition to the obligations in Paragraph 5 above, during the Term of the Agreement, should the Company learn of credible evidence or allegations of violations of the DMCA or of copyright laws or regulations, the Company shall promptly report such evidence or allegations to the Office.

## PAYMENT OF MONETARY PENALTY

7.     The Office and the Company agree that application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

a.     The 2018 USSG are applicable to this matter.

b.     <u>Offense Level—DMCA (Highest Offense Level)</u>.  Based upon USSG § 2B5.3 and the absence of any increase in the offense level under § 3D1.4, the total offense level is 14, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Offense Level | **8** |
| (b)(1) | "Infringement Amount" Exceeding $15,000 | **+4** |
| | **Total Offense Level** | **12** |

c.     <u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(1), the base fine is $70,000

d.     <u>Culpability Score</u>.  Based upon USSG § 8C2.5, the culpability score is 4, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |

| | | |
|---|---|---|
| (b)(5) | the organization had 10 or more employees and an individual within substantial authority personnel participated in the offense | +1 |
| (g)(2) | The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -2 |

**TOTAL**          4

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $70,000 |
| Multipliers | 0.8 (min) / 1.6 (max) |
| Fine Range | $56,000 to $112,000 |

The Company agrees, based on the application of the United States Sentencing Guidelines, that the appropriate total criminal penalty is $60,000 (the "Total Criminal Fine"). The Company further agrees that the Company will pay the United States the Total Criminal Fine no later than ten (10) business days after the date of the execution of this agreement. The Company and the Office agree that the monetary penalty is appropriate given the facts and circumstances of this case, including the factors described in Paragraph 4 above. The $60,000 monetary penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Office that the $60,000 monetary penalty is the maximum penalty that may be imposed in any future prosecution, and the Office is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Office agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. The Company and the Office also acknowledge that the calculation for a fine set

forth above is based upon information known to the Office at the time of the execution of this agreement, including information provided by the Company, and that, if the Office obtains additional information establishing that the amount of loss was greater than $40,000—the amount upon which the above Guidelines calculation was based, see USSG § 2B5.3(b)(1)—the Office may seek an additional fine and/or restitution based upon that greater loss amount. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of this $60,000 monetary penalty. The Company shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source with regard to the penalty or disgorgement amounts that the Company pays pursuant to this Agreement or any other agreement concerning the conduct set forth in the Statement of Facts entered into with any enforcement authority or regulator.

## CONDITIONAL RELEASE FROM LIABILITY

8.      Subject to Paragraphs 12 through 15 below, the Office agrees, except as provided in this Agreement, that it will not bring any criminal or civil case against the Company relating to any of the conduct described in either the Statement of Facts or the Information filed pursuant to this Agreement. This Agreement does not provide any protection against prosecution for any future conduct by the Company. In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company. The Office, however, may use any information related to the conduct described in the Statement of Facts against the Company:

7

a.     in a prosecution for perjury or obstruction of justice;

b.     in a prosecution for making a false statement;

c.     in a prosecution or other proceeding relating to any crime of violence; or

d.     in a prosecution or other proceeding relating to a violation of any

provision of Title 26 of the United States Code.

CORPORATE COMPLIANCE PROGRAM

9.     The Company represents that it has implemented and will continue to implement a compliance and ethics program throughout its operations, designed to prevent and detect violations of the DMCA and other applicable copyright laws and regulations.

DEFERRED PROSECUTION

10.     In consideration of the undertakings agreed to by the Company herein, the Office agrees that any prosecution of the Company for the conduct set forth in the Statement of Facts, and for the conduct that the Company disclosed to the Office prior to the signing of this Agreement, be and hereby is deferred for the Term.   To the extent there is conduct disclosed by the Company that the parties have specifically discussed and agreed is not covered by this Agreement, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

11.     The Office further agrees that if the Company fully complies with all of its obligations under this Agreement, the Office will not continue the criminal prosecution against the Company described in Paragraph 1 above and, at the conclusion of the Term, this Agreement shall expire.   Within six (6) months of the Agreement's expiration, the Office shall seek dismissal with prejudice of the Information filed against the Company described in Paragraph 1

8

above, and agrees not to file charges in the future against the Company based on the conduct described in this Agreement and the Statement of Facts.

## BREACH OF THE AGREEMENT

12.     If, during the Term, the Company: (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; or (d) otherwise fails specifically to perform or to fulfill completely each of the Company's obligations under the Agreement, regardless of whether the Office becomes aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Office has knowledge, including, but not limited to, the charges in the Information described in Paragraph 1 above and charges that arise from the conduct set forth in the Statement of Facts, which may be pursued by the Office in the United States District Court for the Eastern District of New York or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Office's sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the

9

Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Office is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

13. In the event the Office determines that the Company has breached this Agreement, the Office agrees to provide the Company with written notice prior to instituting any prosecution resulting from such breach. Within thirty (30) days of receipt of such notice, the Company shall have the opportunity to respond to the Office in writing to explain the nature and circumstances of the breach, as well as the actions the Company has taken to address and remediate the situation, which the Office shall consider in determining whether to pursue prosecution of the Company.

14. In the event that the Office determines that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Office or to the Court, including the Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Office against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other

10

federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Office.

15.     The Company acknowledges that the Office has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment. The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

16.     Thirty (30) days after the expiration of the period of deferred prosecution specified in this Agreement, the Company, by the President of the Company, will certify to the Office that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

11

SALE, MERGER, OR OTHER CHANGE IN CORPORATE FORM OF COMPANY

17.     Except as may otherwise be agreed by the parties in connection with a particular

transaction, the Company agrees that in the event that, during the Term, it undertakes any change

in corporate form, including if it sells, merges, or transfers business operations that are material

to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates

involved in the conduct described in the Statement of Facts, as they exist as of the date of this

Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change

in corporate form, it shall include in any contract for sale, merger, transfer, or other change in

corporate form a provision binding the purchaser, or any successor in interest thereto, to the

obligations described in this Agreement.   The Company shall obtain approval from the Office at

least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in

corporate form, including dissolution, in order to give the Office an opportunity to determine if

such change in corporate form would impact the terms or obligations of the Agreement.

PUBLIC STATEMENTS BY COMPANY

18.     The Company expressly agrees that it shall not, through present or future

attorneys, officers, directors, employees, agents or any other person authorized to speak for the

Company, make any public statement, in litigation or otherwise, contradicting the acceptance of

responsibility by the Company set forth above or the conduct described in the Statement of Facts.

Any such contradictory statement shall, subject to cure rights of the Company described below,

constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution

as set forth in Paragraphs 12 through 14 of this Agreement.   The decision whether any public

statement by any such person contradicting a fact contained in the Statement of Facts will be

12

imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Office. If the Office determines that a public statement by any such person contradicts in whole or in part the conduct described in the Statement of Facts, the Office shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

19. The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates, issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Office to determine: (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Office and the Company; and (b) whether the Office has any objection to the release.

20. The Office agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to such authorities, the

13

Office is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

LIMITATIONS ON BINDING EFFECT OF AGREEMENT

21.     This Agreement is binding on the Company and the Office but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Office will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

NOTICE

22.     Any notice to the Office under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Chief, National Security and Cybercrime Section, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York 11201.  Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Michael Calabria, President, Constructure Technologies, LLC, 425 Broadhollow Rd #425, Melville, NY 11747, with a copy to Thomas A. Kenniff, Esq., Raiser & Kenniff, P.C., 87 Walker Street, New York, New York 10013.  Notice shall be effective upon actual receipt by the Office or the Company.

14

## COMPLETE AGREEMENT

23.     This Agreement, including its attachments, sets forth all the terms of the

agreement between the Company and the Office.   No amendments, modifications or additions to

this Agreement shall be valid unless they are in writing and signed by the Office, the attorneys

for the Company and a duly authorized representative of the Company.

AGREED:

FOR CONSTRUCTURE TECHNOLOGIES, LLC:

_____          _____
Michael Calabria                     Thomas A. Kenniff, Esq.
President                            Raiser & Kenniff, P.C.
Constructure Technologies, LLC       87 Walker Street
                                     New York, New York 10013
                                     Counsel to the Company

Date: _____9 -15 21_____


FOR THE U.S. DEPARTMENT OF JUSTICE:


JACQUELYN M. KASULIS
Acting United States Attorney
Eastern District of New York


_____
David K. Kessler
Assistant U.S. Attorney

Date: ____9/15/21____


15

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Constructure Technologies, LLC (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the other owner of Constructure, Joseph Keegan. I have advised and caused outside counsel for the Company to advise Mr. Keegan fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the President of the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: _9-15-21_

CONSTRUCTURE TECHNOLOGIES, LLC

By: _____
Michael Calabria
President

16

## CERTIFICATE OF COUNSEL

I am counsel for Constructure Technologies, LLC (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the owners of the Company, Michael Calabria and Joseph Keegan (the "Owners"). Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Owners of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Owners, is an informed and voluntary one.

Date: 9-15-21

By: _____
Thomas A. Kenniff, Esq.
Raiser & Kenniff, P.C.
87 Walker Street
New York, New York 10013
Counsel for Constructure Technologies, LLC

17

<u>CERTIFICATE OF CORPORATE RESOLUTIONS</u>

WHEREAS, Constructure Technologies, LLC (the "Company") has been engaged in discussions with the United States Attorney's Office for the Eastern District of New York (the "Office") regarding issues arising in relation to certain violations of the Digital Millennium Copyright Act and other copyright laws and regulations by employees of the Company; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Office; and

WHEREAS, outside counsel for the Company has advised the owners of the Company, Michael Calabria and Joseph Keegan (the "Owners"), of the Company's rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Office;

Therefore, the Owners have RESOLVED that:

1.     The Company: (a) acknowledges the filing of an Information charging the Company with a violation of 17 U.S.C. §§ 1201(a)(1)(A) and 1204(a)(1); (b) knowingly waives indictment on such charges and enters into a deferred prosecution agreement with the Office (the "Agreement"); and (c) agrees to accept a monetary penalty against the Company totaling $60,000, and to pay such monetary penalty to the United States Treasury with respect to the conduct described in the Information;

2.     The Company accepts the terms and conditions of this Agreement, including, but not limited to: (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts of any objection

1

with respect to venue; (c) its consent to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York; and (d) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.    The President of the Company, Michael Calabria, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by the Owners with such changes as the President may approve;

4.    The President of the Company, Michael Calabria, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.    All of the actions of the President of the Company, Michael Calabria, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: 9-15-21

By: _____
Michael Calabria
President
Constructure Technologies, LLC

By: _____
Joseph Keegan
Chief Technology Officer
Constructure Technologies, LLC

ATTACHMENT A

STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Deferred

Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the

Eastern District of New York (the "Office" or the "United States") and the defendant

Constructure Technologies, LLC ("Constructure" or the "Company").   Constructure hereby

agrees and stipulates that the following information is true and accurate.   Certain of the facts

herein are based on information obtained from third parties by the Office through their

investigation and described to Constructure.   Constructure admits, accepts, and acknowledges

that it is responsible for the acts of its officers, directors, employees, and agents as set forth

below.   Should the Office pursue the prosecution that is deferred by the Agreement,

Constructure agrees that it will neither contest the admissibility of, nor contradict, this Statement

of Facts in any such proceeding.   The Office's evidence establishes the following facts during

the relevant time frame and proves beyond a reasonable doubt the charges set forth in the

Criminal Information filed in the United States District Court for the Eastern District of New

York pursuant to the Agreement:

CONSTRUCTURE AND RELEVANT INDIVIDUALS

1.      Constructure was a limited liability company located in Melville, New York.

Constructure provided information technology services, helping install, manage and service

various networks and other technology products for small and medium sized businesses.

2.      Michael Calabria ("Calabria") was the President of Constructure.

3.      Joseph Keegan ("Keegan") was the Chief Technology Officer of Constructure.

4.      Casey Silver ("Silver") was the "Project Manager" of Constructure.

1

## THE SCHEME TO CIRCUMVENT COPYRIGHT PROTECTION SYSTEMS

5.      Between 2011 and 2018, Constructure sold, installed, and provided services for computer programs that were copyrighted and then sold by software companies ("Victim Software Companies").   Each of the computer programs was a copyrighted work protected under Title 17 of the United States Code.

6.      Some of the aforementioned computer programs were designed so that they could not be activated until a user paid the company for a "license" to use that software.   In purchasing a license, the user received a "key"—a string of letters, numbers and symbols—that, when entered into the copy of software obtained by the user, activated the software.   Constructure's clients generally paid Constructure to purchase licenses for such computer programs and to activate those programs with a legitimate license key.

7.      Starting in or about 2011, Calabria, Keegan, and Silver helped to operate Constructure's business in part by installing unlicensed versions of software from Victim Software Companies using cracking programs or key generators, which allowed Constructure to activate copies of the software without paying for a license and obtaining a key.   Constructure employees, often at the express direction of Calabria or Keegan, used cracking programs or key generators to install software from multiple Victim Software Companies, including VMWare, a global cloud computing software company.

8.      Constructure employees, including Keegan, obtained license keys and cracking programs from the Internet.   They also tested those programs on a computer server located in the basement of Constructure's office in Melville, New York.   The cracking programs and key generators were stored on Constructure's computer servers, including in subfolders labeled "/Cracks" and "/CTNY [Constructure Technology NY] Cracks."

2

9.    Cracking programs used by Constructure employees were also stored on a file-sharing site controlled by Constructure so that the programs could be accessed and used remotely by Constructure employees.

10.    By installing working, but unlicensed, versions of software, Constructure was able to bill a customer for the software, under the pretense that Constructure purchased a copy or copies on behalf of the customer, while not actually paying for the copies of the software.   In addition, Constructure was able to provide faster support to its clients by fixing problems using cracked software instead of purchased software.

11.    Constructure employees, including Calabria, Keegan, and Silver, did not inform Constructure's clients or the Victim Software Companies whose computer programs were being cracked that Constructure employees used "cracks" to install those programs.   At times, when a Constructure client or a Victim Software Company became aware of an unlicensed activation of a computer program or experienced operational problems, Calabria, Keegan, and Silver often either installed or directed other Constructure employees to purchase and activate a license for that program.

12.    Constructure employees communicated about the use of cracking programs and key generators to conduct Constructure business, including in the following emails:

       a.    On or about March 15, 2011, a Constructure employee wrote to Calabria and Keegan: "the trial [for a software program] expired [client] wants her license keys . . . should I do the same as last time and use our crack?" Calabria responded: "Yes."

       b.    On or about March 18, 2011, a Constructure employee wrote Keegan about the "[license] keys for [a client]" that were "failing."   Keegan forwarded that email to Calabria, writing: "We need to get these sites legit. Let's not blow this customer by saving a few thousands [sic] $$ on pirated keys."

3

c.      On or about October 31, 2013, Silver emailed Calabria about a
        Constructure client: "We need to buy the license [for a Victim Software
        Company product], the crack no longer works."

d.      On or about January 30, 2014, Keegan emailed another Constructure
        employee:   "Can you see if you can rustle up a Keygen [key generator
        program] for [a Victim Software Company product]?"   The employee
        replied: "It'll be up soon."

e.      On or about September 15, 2014, Silver wrote to Calabria about software
        licenses for a Constructure client: "Do we have a license for them, I have
        not been sent one?   Should we use a crack?"   Calabria responded:
        "crack."

f.      On or about November 26, 2014, Keegan emailed Silver and another
        Constructure employee, writing:   "For all VMWare projects recently
        rolled out, please let me know if we have received official licensing for
        VMWare software or not."   Silver responded by listing five clients and
        whether or not a "crack" had been used:
        "[Client 1] – Cracked
        [Client 2] – Official
        [Client 3] – Official
        [Client 4] – Cracked
        [Client 5] – Cracked"

g.      On or about February 25, 2015, in response to an email from another
        Constructure employee about a license for a Constructure client, Silver
        wrote: "Use the crack," and the employee responded: "Cracking now sir."

h.      In or about April 2016, another Constructure employee emailed Keegan:
        "For [Client's] local backup has been failing for over a month.
        [Constructure employee] has been primarily working on this, he is up to
        the point that he needs to call [a Victim Software Company] but [Client] is
        cracked and I was told not to contact [Victim Software Company] support
        if the client is cracked."

i.      In January 2017, a Constructure employee received an email from a
        representative of a software company that made backup software, about a
        copy of a software program that was not working.   The representative
        wrote: "I have some bad news.   This [serial] number is cracked/pirated
        serial."   The email was forwarded to Keegan, who replied: "OK let's
        purchase the product for them they need it and it's inexpensive enough."

j.      On or about May 15, 2017, Calabria emailed Keegan and other
        Constructure employees about a Constructure client seeking software
        licenses: "[The client] wants to know what we can do as a work around

4

until he has the budget for the upgrade next year."  Keegan responded: "You know what we can do," referring to the use of a cracking program or key generator.

k.    On or about February 19, 2018, Silver emailed another Constructure employee about certain software, including VMWare, for a client, writing: "I told you to order the licensing, we didn't, so ill [sic] just crack it."

13.    During the time period in which Constructure employees installed cracked programs, the "Company Handbook" for Constructure employees stated:

**Computer Software Licensing**

The company purchases or licenses the use of various computer software programs.   Neither the company nor any of the company's employees have the right to duplicate this computer software or its related documentation.

The company does not condone the illegal duplication of software. You must use the software in accordance with the license agreement.   This policy applies not only to individual desktop computers and laptops but to local area networks as well.

Employees learning of any misuse of software or related documentation within the company shall notify a member of management.   Employees who reproduce, acquire or use unauthorized copies of computer software will be subject to discipline, up to and including discharge.

14.    From approximately 2011 to approximately 2018, Constructure employees installed cracked software programs for multiple clients, including clients located in Hicksville, New York; Mineola, New York; Manhattan, New York; and Bridgewater, New Jersey.

15.    From approximately 2011 to approximately 2018, through the use of cracking programs and key generators, Constructure employees deprived the Victim Software Companies of at least $40,000 that Constructure otherwise would have paid to purchase license keys.

5